**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

_____
                                                    )
IN RE:                                              )
                                                    )
ALANS CORNER, LLC                                   )        Case No. 17-12669-BFK
                                                    )        Chapter 7
                                                    )
         Debtor                                     )
_____)

**TRUSTEE'S MOTION TO APPROVE THE SALE
OF REAL PROPERTY FREE AND CLEAR OF
LIENS AND REQUESTING RELATED RELIEF**

Janet M. Meiburger, Chapter 7 Trustee in the above-named case, by her undersigned

counsel, hereby moves, pursuant to 11 U.S.C. § 363, Fed. R. Bankr. P. 6004, and Local Rules

6004-1 and 6004-2, for authority to sell the Debtor's real property located at 43184 Town Hall

Plaza, Chantilly, Virginia 20152 (the "Property"), free and clear of liens, encumbrances and

other interests, other than the Permitted Exceptions under the Contract, and to pay at closing the

first mortgage held by EagleBank, the real estate commissions, the past due real estate taxes and

the sale related expenses, and for certain other relief as described herein, and in support of this

Motion states as follows:

1.       On August 3, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 7 of the Bankruptcy Code. Janet M. Meiburger is the duly qualified and

acting Trustee.

2.       Included in the bankruptcy estate is the Debtors' 100% ownership interest in the

real property located at 43184 Town Hall Plaza, Chantilly, Virginia 20152 (the "Property").

_____
Janet M. Meiburger, VA Bar No. 31842
The Meiburger Law Firm, P.C.
1493 Chain Bridge Road, Suite 201
McLean, VA 22101
(703) 556-7871
Counsel to Chapter 7 Trustee

3.      On May 15, 2009, Discovery Station, LLC ("Discovery Station") entered into a lease to occupy the Property (the "Lease"). Discovery Station is a Virginia limited liability company.  On information and belief, Discovery Station is owned by the same individuals who own the Debtor, Alan and Carolyn Berlin, and is managed by their son and daughter-in-law, Lee Berlin and Jennifer Berlin.  Discovery Station operates a child care center at the Property.

4.      On November 7, 2017, this Court entered an order approving a real estate listing agreement and employing Stephen Karbelk of Century 21 New Millennium as exclusive listing agent for the sale of the Property (the "Order") (Docket No. 32).

5.      The Trustee has accepted a contract to sell the Property for $4,300,000.00, which is the asking price, subject to Court approval. A copy of the contract is attached hereto as Exhibit A (the "Contract").  The Contract is for the sale of the Property "as is." The buyer is Insite Real Estate Investment Properties, LLC (the "Buyer"). The user of the Property will be a nationally recognized day care company with over 1,000 locations. The Buyer is represented by MacKenzie Commercial Real Estate Services, LLC. To the best of the Trustee's knowledge, neither the Buyer, its principals nor any persons or entities related to or affiliated with the Buyer have any relation to the Debtor, the listing agent Stephen Karbelk, or the Trustee, and the Trustee believes that the Buyer is a good faith purchaser within the meaning of Bankruptcy Code § 363(m). The Buyer has paid the Earnest Money Deposit in the amount of $50,000.00.

6.      The primary terms of the contract are as follows:

   a.   The Contract is subject to an Investigation Period, beginning on the Effective Date of the Contract, February 27, 2018 and ending sixty (60) days after the date of the entry of the Order approving the sale.

2

b.  The Contract is subject to a breakup fee of $50,000.00, to be paid to at the closing

on a sale to an alternate buyer. The requested breakup fee is 1.16% of the

purchase price. The Trustee believes that this amount is reasonable, and requests

that it be approved.

c.  The Contract includes all Personal Property held by the Debtor and located at the

Property.

d.  The Contract allows the Buyer to terminate the Contract if an Order on this

motion has not been entered by April 27, 2018, if the Court requires changes to

the Contract that are not acceptable to the Buyer, or if the Order entered by the

Court is not acceptable to the Buyer.

e.  The closing will take place within thirty (30) days of the end of the Investigation

Period and ten days after the satisfaction or waiver of the Closing Conditions.

f.  The Lease must be terminated at or before the closing, and the Trustee must

deliver exclusive possession of the Property to the Buyer at closing.

7.      The Trustee obtained a title abstract for the Property and it showed two mortgages

against the Property.  The first mortgage is held by EagleBank, successor by merger to Virginia

Heritage Bank. According to the proof of claim filed on behalf of EagleBank, the amount due

was $3,556,930.19 as of January 17, 2018.  According to the proof of claim, $38,691.59 of this

amount is late charges. Pursuant to §726 (a)(4), these late charges are subordinated and will not

be paid at closing. This leaves $3,518,238.60 due under EagleBank's mortgage as of January 17,

2018. The Trustee estimates that the amount due at closing, other than late fees, will be

approximately $3,630,000.00.  By this Motion, the Trustee requests that the Court approve

payment of the EagleBank unsubordinated portion of the mortgage in full at closing.

8.      The second mortgage is held by U.S. Small Business Administration ("SBA").

According to the proof of claim filed on behalf of SBA, the mortgage is in arrears in the amount

of $1,545,676.84 as of August 8, 2017. The sale of the Property is subject to the agreement of the

SBA regarding the treatment of its claim. The Trustee has had preliminary discussions with the

SBA, and she believes that an agreement can be reached.

9.      In addition, the Trustee requests that the Court approve the payment, at closing, of

the real estate commission of 5.5%, with 2.75% being paid to MacKenzie Commercial Real

Estate Services, LLC and 2.75% being paid to Century 21 New Millennium, past due real estate

taxes and the ordinary costs of sale, such as title costs and real estate tax pro rations.

10.     The Trustee anticipates that the proceeds from the sale will be as follows:

| | |
|---|---|
| Sale price | $4,300,000.00 |
| Estimated EagleBank Payoff (as of 5/31/2018) | ($3,630,000.00) |
| Real estate commission (5.5%) | ($236,500.00) |
| Past Due Real Estate Taxes | ($40,909.00) |
| Survey | ($5,000.00) |
| Other costs of sale (estimated) | ($20,000.00) |
| Total: | $367,591.00 |

11.     Trustee believes that there will be no federal and state income taxes owed with

respect to the sale because the sale price is substantially below the original purchase price.

12.     Discovery Station is in default under the Lease.  On December 11, 2017, the

Trustee initiated an Adversary Proceeding against Discovery Station (Case No. 17-01132-BFK)

(the "Adversary Proceeding"), in which the Trustee is requesting judgment against Discovery

Station for turnover of possession of the Property and for the unpaid rent under the Lease, in an

amount to be determined. Discovery Station has not filed an answer to the Complaint in the

Adversary Proceeding, and the Trustee intends to file a motion for default judgment. The Trustee

also intends to file a motion to reject the Lease.

13.      The Property will be conveyed free and clear of all liens, encumbrances and

interests, other than the Permitted Exceptions under the Contract.  The liens, encumbrances and

interests as to which the Property will be conveyed free and clear include, but are not limited to,

the EagleBank mortgage, which will nevertheless be paid at Closing, the SBA Mortgage, the

Lease, and all tax claims and liens, as more particularly described in the Contract.  To the extent

that such liens, encumbrances and interests are valid, are not paid at closing, and are not waived,

they will attach to the proceeds of sale.

14.      The Trustee believes that the proposed sale is in the best interests of the

bankruptcy estate because it is an arm's length sale to an unrelated buyer and therefore reflects

the market value of the Property.

15.      The Trustee requests, pursuant to 11 U.S.C. §363(m) and Federal Rule of

Bankruptcy Procedure 6004(h), that the order approving the sale shall not be stayed for fourteen

(14) days after entry, as would otherwise be required by Bankruptcy Rule 6004(h), and that,

notwithstanding any provision of the Bankruptcy Code or Bankruptcy Rules to the contrary,

including but not limited to Bankruptcy Rule 6004(h), the order approving the sale will be

effective and enforceable immediately upon entry.

WHEREFORE, the Trustee respectfully requests that the Court enter an order authorizing

the sale of the Debtor's real property located at 43184 Town Hall Plaza, Chantilly, Virginia

20152, free and clear of liens; authorizing payment of the EagleBank mortgage, the real estate

commission, past due real estate taxes and the sale related expenses; and granting such other and

further relief as the Court deems appropriate.

Respectfully submitted,

THE MEIBURGER LAW FIRM, P.C.

Dated: March 2, 2018                    By:  /s/ Janet M. Meiburger
                                             Janet M. Meiburger, Esq.,VSB No. 31842
                                             The Meiburger Law Firm, P.C.
                                             1493 Chain Bridge Road, Suite 201
                                             McLean, Virginia 22101
                                             (703) 556-7871
                                             Counsel to Chapter 7 Trustee

<u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 2nd day of March, 2018, a true and correct copy of the

foregoing Trustee's Motion to Approve the Sale of Real Property Free and Clear of Liens and

Requesting Related Relief will be served by ECF e-mail pursuant to the applicable Standing

Order of the Court, and by first-class mail, postage prepaid, on the following:


InSite Real Estate Investment Properties, L.L.C.
c/o InSite Real Estate, L.L.C.
1400 16th Street, Suite 300
Oak Brook, IL 60523
Attn: J.R. Kyes

InSite Real Estate Investment Properties, L.L.C.
c/o InSite Real Estate, L.L.C.
1400 16th Street, Suite 300
Oak Brook, IL 60523
Attn: Robin Rash, Chief Legal Officer

MacKenzie Retail, LLC
111 S. Calvert Street
Baltimore, MD 21202
Attn: Tom Fidler

Century 21 New Millennium
20405 Exchange Street, Suite 221
Ashburn, VA 20147
Attn: Stephen Karbelk

RL Title and Escrow, Inc.
8500 Leesburg Pike #402
Vienna, VA  22182
Attn.: Amir Raminpour


                         /s/ Janet M. Meiburger
                        Janet M. Meiburger




E:\Mydocs\Trustee\Alans Corner, LLC (17-12669)\Pleadings\Sale of Property.Insite.Motion.2.doc

# EXHIBIT A

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

### PURCHASE AND SALE CONTRACT

This Purchase and Sale Contract (the "**Contract**") is entered into by Purchaser and Seller as of the Effective Date.

### BASIC TERMS AND DEFINITIONS

| | |
|---|---|
| "Purchaser": | INSITE REAL ESTATE INVESTMENT PROPERTIES, L.L.C., an Illinois limited liability company |
| "Seller": | Alans Corner, LLC, Debtor in Chapter 7 bankruptcy Case No. 17-12669-BFK in the United States Bankruptcy Court for the Eastern District of Virginia, acting through Janet M. Meiburger, not individually, but solely in her capacity as Chapter 7 Trustee for Alans Corner, LLC (the "**Trustee**") |
| "Property": | Generally, the real property and improvements located at 43184 Town Hall Plaza in Chantilly, VA, consisting of approximately 1.23 acres of land, one (1) building containing approximately 13,352 square feet (the "**Building**"), and all related improvements. The Property is more specifically defined in Section 1. |
| "Purchase Price": | $4,300,000.00 |
| "Earnest Money Deposit": | $50,000.00 |
| "Effective Date": | The later of the dates that the Contract has been executed by Purchaser or by Seller. |
| "Investigation Period": | Beginning on the Effective Date and ending on the date that is sixty (60) days after the date of entry of the Sale Order (defined below). |
| "Lease": | The Lease dated as of May 15, 2009 between Alans Corner, LLC, as landlord, and Discovery Station, LLC, as tenant, encumbering the Property. |
| "Tenant": | Discovery Station, LLC, being the only tenant of the Property |
| "Landlord": | Alans Corner, LLC |
| "Closing Date": | The later of (1) thirty (30) days after the end of the Investigation Period; and (2) ten (10) days after the date all of Purchaser's Closing Conditions have been satisfied or waived by Purchaser. |
| Addresses for Notice to Purchaser: | InSite Real Estate Investment Properties, L.L.C. c/o InSite Real Estate, L.L.C. 1400 16th Street, Suite 300 Oak Brook, IL 60523 Attn: J.R. Kyes Phone: 630/617-9144 Fax: 630/617-9120 Email: jkyes@insiterealestate.com |
| | And: |
| | InSite Real Estate Investment Properties, L.L.C. c/o InSite Real Estate, L.L.C. |

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

1400 16th Street, Suite 300
Oak Brook, IL 60523
Attn: Robin Rash, Chief Legal Officer
Phone: 630/617-9117
Fax: 630/617-9120
Email: rrash@insiterealestate.com

(both are required for notice to be effective)

**Address for Notice to Seller:**   Janet M. Meiburger, Chapter 7 Trustee
1493 Chain Bridge Road, Suite 201
McLean, Virginia  22101
Phone: 703-556-7871
Fax: 703-556-8609
Email: janetm@meiburgerlaw.com

**"Purchaser's Broker":**   MacKenzie Commercial Real Estate Services, LLC
2328 W. Joppa Road
Lutherville, MD  21093
Attn: Scott Wimbrow
Phone: 410-953-0354
Email: swimbrow@mackenziecommercial.com

**"Seller's Broker":**   Century 21 New Millennium
20405 Exchange Street, Suite 221
Ashburn, VA 20147
Attn: Stephen Karbelk
Phone: 703-858-2770
Cell: 571-481-1037
Email: stephen.karbelk@auctionmarkets.com

**"Escrow Agent":**   RL Title and Escrow, Inc.
8500 Leesburg Pike #402
Vienna, VA  22182
Attn.: Amir Raminpour
Phone. 703-942-6464
Fax. 703-942-6468
Email. araminpour@swsrlaw.com

**"Title Company":**   First American Title Insurance Company
National Commercial Services
30 N. LaSalle Street, Suite 2700
Chicago, IL 60602
Title Underwriter: Dennis Getches, 312/917-7249, dgetches@firstam.com

**Exhibits:**   The following exhibits are attached to and incorporated in this Contract:

Exhibit A – Legal Description of Property
Exhibit B – Site Plan/Aerial Photograph
Exhibit C – Intentionally Omitted
Exhibit D – Seller Deliveries Notice
Exhibit E – Title and Survey Specifications

- 2 -

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

## TERMS AND CONDITIONS

1.  **SALE AND PURCHASE; DESCRIPTION OF THE PROPERTY.**

    1.1    Agreement to Purchase and Sell.  Seller agrees to sell the Property to Purchaser, and Purchaser agrees to purchase the Property from Seller, "as is," on the terms and conditions in this Contract. The Property includes the Land, the Improvements, the Personal Property, and the Intangible Property.

    1.2    Land.  The term "**Land**" means fee simple title to the real property legally described in Exhibit A and shown on the Site Plan/Aerial Photograph attached as Exhibit B including: (a) all rights appurtenant to the Land, whether or not of record; and, (b) all tenements, hereditaments, privileges, and appurtenances belonging or related to the Land, including all mineral, oil, gas, and other hydrocarbon substances on and under the Land. If a legal description of the Land is not available on the Effective Date, the parties will amend the Contract to attach a legal description after preparation of the Survey.

    1.3    Improvements.  The term "**Improvements**" means the Building and all other buildings, structures, driveways, parking areas, sidewalks, landscaped areas, amenities, and similar items on the Land.

    1.3    Personal Property.  The term "**Personal Property**" means (a) all personal property of Seller which is located at the Property, (b) all kitchen equipment and exterior playground equipment located at the Property and (c) all fixtures and all items of personal property owned by Seller that are used or useful in connection with the ownership, operation, use, or maintenance of the Property, including all heating, ventilating, incinerating, lighting, plumbing, electrical, and air-conditioning fixtures, appliances, and other equipment normally used for the operation or maintenance of the Property.

    1.5    Intangible Property.  The term "**Intangible Property**" means all public or private, recorded or unrecorded permits, approvals, licenses, rights, certificates of occupancy, development rights, contractor or manufacturer warranties, and all other intangible property relating to the use, maintenance, or operation of the Property, which are owned by or issued to Seller. Intangible Property does not include any service or vendor contracts related to the Property to which Seller is a party, all of which must be terminated by Seller on or before the Closing Date, unless otherwise agreed by the parties in writing.

    1.6    Additional Bankruptcy Conditions.  This Contract and the obligations of the parties hereunder are subject to the approval of the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"). Promptly following the Effective Date, the Trustee will file the required Motion(s) with the Bankruptcy Court to obtain Bankruptcy Court approval of this Contract and the sale of the Property to the Purchaser pursuant to the terms hereof.

    Purchaser's obligations under this Contract are expressly conditioned upon the Bankruptcy Court's entry of one or more orders (a) approving this Contract, (b) approving the sale of the Property to Purchaser under Section 363 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests which are Unpermitted Matters (as defined in Section 5.3), including, without limitation, the liens of EagleBank, the Small Business Administration and Loudoun County and the leasehold interest of Tenant, and (c) irrevocably extinguishing all right, title and interest of the Tenant under the Lease, including, without limitation, any right of possession and right of use of the Property under Section 365(h)(1)(A)(ii) of the Bankruptcy Code or under Virginia law (collectively, the "**Sale Order**"). The Trustee shall provide Purchaser with a draft of the Sale Order before the Trustee submits the Sale Order to the Bankruptcy Court. The Sale Order shall be subject to the written approval of Purchaser.

    The Purchaser may elect to terminate this Contract if (a) the Sale Order has not become a final and non-appealable order by April 27, 2018 or (b) the Bankruptcy Court requires changes to this Contract

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

that are not acceptable to Purchaser in its sole discretion or (c) the Sale Order that is entered by the Bankruptcy Court is not acceptable to Purchaser in its sole discretion.

Until the Bankruptcy Court hearing on the sale of the Property to Purchaser, Seller may continue to market the Property for sale. If the Seller receives an offer for the Property at or before the Bankruptcy Court hearing on the Sale of the Property to Purchaser, which Seller determines is better than this Contract, then Purchaser shall have the right to submit further offers along with a markup of this Contract, and Seller and Purchaser shall agree, subject to any necessary approval by the Bankruptcy Court, on bidding procedures reasonably acceptable to Seller and Purchaser.

The Motion(s) that Seller files with the Bankruptcy Court for approval of this transaction shall include a request that the Bankruptcy Court approve a breakup fee in an amount equal to Fifty Thousand Dollars ($50,000.00) (the "**Breakup Fee**"), to be paid in the event Seller consummates a transaction (regardless of the form thereof) with respect to the Property other than a transaction with Purchaser and Purchaser has not otherwise terminated this Contract (an "**Alternate Sale**"). The agreement to request the Breakup Fee is a material condition to Purchaser entering into this Contract, without which Purchaser would not agree to do so. Seller agrees to diligently seek approval of the Breakup Fee by the Bankruptcy Court. The Sale Order shall provide that the Breakup Fee is payable to Purchaser at closing on any Alternate Sale. The Breakup Fee, if approved by the Bankruptcy Court, shall survive termination of this Contract and shall constitute a first priority lien against the proceeds of an Alternate Sale and an administrative expense in the Alans Corner, LLC bankruptcy case under Sections 503(b), 506 and 507(a)(1) of the Bankruptcy Code.

2.      **PAYMENT OF PURCHASE PRICE.** The Purchase Price will be paid by Purchaser to Seller as follows:

2.1      Earnest Money Deposit.   Within three (3) business days after the Effective Date, Purchaser will deliver the Earnest Money Deposit to Escrow Agent. Escrow Agent will hold the Earnest Money Deposit in escrow pursuant to the terms and conditions of this Contract. The Earnest Money Deposit will be applied to the Purchase Price at Closing.

Purchaser shall receive a full refund of the Earnest Money Deposit if (a) Purchaser elects to terminate the Contract during the Investigation Period pursuant to Section 4.4 hereof, or (b) Purchaser elects to terminate the Contract pursuant to Section 1.6 or Section 7.2 hereof.

2.2      Balance of Purchase Price.   If the consummation of this transaction (the "**Closing**") occurs under the terms and conditions of this Contract, the balance of the Purchase Price, plus or minus prorations, will be paid by Purchaser to Seller on the Closing Date in immediately available funds.

3.      **SELLER DELIVERIES.** Within three (3) business days after the Effective Date, Seller will deliver to Purchaser the letter attached to this Contract as Exhibit D (the "**Seller Deliveries Notice**") and the items listed in the Seller Deliveries Notice ("**Seller Deliveries**"), to the extent the Seller Deliveries are applicable to the Property and reasonably within the Trustee's possession or control. Seller shall not be obligated to institute legal proceedings to obtain any of the Seller Deliveries, such as filing motions to conduct Rule 2004 examinations. If any of the Seller Deliveries are not applicable to the Property, or are not reasonably within the Trustee's possession or control, then Seller will indicate this in the Seller Deliveries Notice. All items of Seller Deliveries will be held in confidence by Purchaser pursuant to the confidentiality provision of this Contract.

4.      **PURCHASER'S INVESTIGATION.**

4.1      Purchaser's Right to Investigate.   From the Effective Date until the Closing Date, Purchaser may: (a) investigate the feasibility of the Property for Purchaser's intended use, including the conduct of any tests, assessments, studies, and interviews that Purchaser deems necessary (including environmental tests and assessments, physical condition inspections and assessments, investigation of government requirements including zoning and other legal requirements, assessments of the availability

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

of utilities, review of the Lease, and interviews with the Tenant); and (b) seek all government, private, and other approvals necessary for Purchaser's intended use of the Property (the "**Approvals**") (steps (a) and (b), "**Purchaser's Investigation**"). Seller will cooperate fully (but at no cost or expense to Seller) with Purchaser in completing Purchaser's Investigation. Purchaser's Investigation will be carried out during reasonable hours. Purchaser's Investigation will be performed at Purchaser's sole cost and expense.

4.2     Purchaser's Right to Enter.  Purchaser acknowledges that the Tenant is in possession of the Property, not Seller or the Trustee.  Seller will use its best efforts to provide Purchaser and its agents, representatives, and contractors with access to the Property to conduct Purchaser's Investigation, as long as (a) at least three (3) business days' notice requesting access is given to the Seller's Broker and (b) the access does not materially disrupt the operations of the Tenant at the Property.  Purchaser will promptly repair any physical damage to the Property caused by Purchaser's Investigation and will promptly remove, bond over, or insure over any mechanic's liens arising from the work performed to complete Purchaser's Investigation.  Purchaser indemnifies and holds Seller harmless from any loss, cost, or damage (including reasonable attorney's fees and costs, but excluding incidental or consequential damages) resulting from Purchaser's failure to comply with its obligations under this Section 4.2.

4.3     Purchaser's Right to Extend.  Purchaser may extend the Investigation Period for one (1) thirty (30) day period by delivering written notice to Seller before the end of the Investigation Period. Within three (3) business days after the time the extension goes into effect, Purchaser will deliver to the Escrow Agent $15,000 as an additional Earnest Money Deposit.  Each additional Earnest Money Deposit will be held and disbursed in the same manner as the initial Earnest Money Deposit.

4.4     Termination.  At any time before the end of the Investigation Period, Purchaser may terminate this Contract by giving written notice to Seller if Purchaser, in its sole and absolute discretion, is not satisfied with the Property for any reason or for no reason.  If Purchaser terminates this Contract under this Section 4.4, then Escrow Agent will return the Earnest Money Deposit to Purchaser, without necessity for consent from Seller, and neither party will have any further obligations or liabilities under this Contract, except as otherwise expressly provided in this Contract.  If Purchaser fails to give this notice, then Purchaser will be deemed not to have terminated this Contract under this Section 4.4.

5.     **TITLE AND SURVEY**.

5.1     Title Commitment.  Promptly after the Effective Date, Purchaser will order from the Title Company a commitment for an owner's policy of title insurance for the Property (the "**Title Commitment**") according to the specifications described in Exhibit E (the "**Title Specifications**") including complete and legible copies of all documents described in the Title Commitment (the "**Title Documents**").  The Title Commitment will be underwritten and provided by the Title Company, who will use Escrow Agent to perform the title search.

5.2     Survey.  Purchaser may order a survey of the Property (the "**Survey**") according to the specifications described in Exhibit E (the "**Survey Specifications**").  Purchaser will pay the cost of the Survey if this Contract is terminated by Purchaser prior to Closing and in such event Purchaser will provide Seller with a copy of the Survey.

5.3     Title and Survey Comments.  After Purchaser's receipt of the Title Commitment, the Title Documents, and Survey, and again following any update or revision to the Title Commitment, Title Documents, and Survey, Purchaser will notify Seller of any liens, encumbrances, and other matters described in those documents that are unacceptable to Purchaser (such matters, the "**Unpermitted Matters**"; such notice, the "**Title and Survey Comment Notice**").  The Unpermitted Matters will be resolved by the Sale Order, which will provide for the sale of the Property free and clear of all Unpermitted Matters.  If the Sale Order does not resolve any Unpermitted Matters to Purchaser's satisfaction and Seller fails or is unable to otherwise cure or remedy all Unpermitted Matters in a manner satisfactory to Purchaser, then Purchaser may exercise its rights under Section 7 of this Contract.  Any matters reflected in any Title Commitment, Title Documents, or Survey that are not objected to by Purchaser or that are resolved by the Sale Order to Purchaser's satisfaction will be "**Permitted Matters**".

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

6.   **SELLER'S COVENANTS.**

6.1   Negative Covenants. From the Effective Date through Closing, Seller will not: (a) transfer any part of the Property; (b) create any easements, liens, mortgages, encumbrances, leases, or other interests on the Property; (c) permit any changes to the zoning classification of the Property; (d) enter into any agreement regarding the Property; (e) market the Property for lease or otherwise accept or negotiate any offers for lease; or (f) modify or amend the Lease in any way other than to terminate the Lease.

Notwithstanding the foregoing but subject to the terms of Section 1.6 of this Contract, Seller may enter into an agreement to sell the Property to another buyer on terms that Seller determines are more advantageous to the bankruptcy estate of Alans Corner, LLC, subject to Bankruptcy Court approval, and/or may enter into an agreement to sell the Property to another buyer upon Purchaser's failure to close under this Contract when required to do so under the terms of this Contract.

6.2   Affirmative Covenants. From the Effective Date through Closing, Seller will: (a) promptly provide Purchaser with copies of all notices of violation of federal, state, or municipal laws, ordinances, regulations, orders, or requirements with respect to the Property, which are actually received by the Trustee; and (b) promptly provide Purchaser with copies of all notices from or on behalf of Tenant which are actually received by the Trustee.

6.3   Intentionally Left Blank.

6.4   Property Condition. At Closing, (a) the Property will be left in good working order and repair similar to the condition of the Property as of December 13, 2017; (b) all kitchen equipment and exterior playground equipment shall remain in good repair and working order similar to the condition of the property as of December 13, 2017; and (c) all debris and trash will be removed from the Property. Any personal property that is left behind by Tenant shall remain in the Property (**"Property Condition Requirements"**). Other than the foregoing, the Property is being sold in "as-is, where-is condition".

If the Property Condition Requirements are not satisfied on the Closing Date, Seller shall have the option to cure the Property Condition Requirements within thirty (30) days after receipt of written notice of the deficiency by Purchaser. If the Property Condition Requirement is not thereafter cured to the satisfaction of Purchaser, then Purchaser may elect, in its sole discretion, to either (x) accept a credit against the Purchase Price at Closing in satisfaction of this requirement, (y) terminate the Contract; or (z) proceed to Closing. If Purchaser elects to terminate the Contract, then (i) Escrow Agent will return the Earnest Money Deposit to Purchaser; and (ii) Purchaser will be relieved of all obligations under this Contract.

7.   **PURCHASER'S CLOSING CONDITIONS.**

7.1   Closing Conditions.   Notwithstanding anything in this Contract to the contrary, Purchaser's obligation to purchase the Property is expressly contingent upon the satisfaction of the following conditions (**"Purchaser's Closing Conditions"**):

7.1.1   There has been no material casualty, condemnation, or other material adverse change to the condition of the Property since the Effective Date and the condition of the Property on the Closing Date is not materially different from the condition of the Property as of the Effective Date.

7.1.2   At the Closing, the Title Company is prepared to issue and deliver to Purchaser an owner's title policy or marked-up title commitment, in the amount of the Purchase Price, which complies with the Title Specifications, dated as of the time of recording of the Deed, and subject only to the Permitted Matters (the "**Title Policy**").

7.1.3   The Sale Order shall be a final, non-appealable order.

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

7.1.4   Purchaser obtains all of its Approvals.

7.1.5   All representations and warranties of Seller under this Contract are true and correct on the Closing Date.

7.1.6   The Lease is terminated effective at or before Closing and Tenant's right to possession of the Property is extinguished effective at or before Closing and Seller delivers exclusive possession of the Property to Purchaser at Closing.

7.2   Failure of Purchaser's Closing Conditions.   If any of Purchaser's Closing Conditions are not satisfied on or before Closing, Purchaser may, by delivering written notice to Seller, elect to: (a) waive the condition(s); (b) terminate this Contract; or (c) allow for a time period during which the condition(s) will be satisfied, and Closing will occur ten (10) days after the condition(s) is satisfied.  If Purchaser elects to waive the condition, the parties will proceed to Closing.   If Purchaser elects to terminate this Contract, the Earnest Money Deposit will be returned to Purchaser without necessity for consent from Seller and neither party will have any further obligations or liabilities under this Contract, except as otherwise expressly provided.

If the Purchaser's Closing Conditions are not met by June 30, 2018, then this Contract may be extended by mutual agreement between Purchaser and Seller without the need for any further Bankruptcy Court approvals.

## 8.   REPRESENTATIONS AND WARRANTIES.

8.1   Seller's Representations and Warranties.   Purchaser acknowledges that the Trustee, as the authorized legal representative of the Seller, is not personally familiar with the Property.  Unless stated otherwise, all representations and warranties contained herein are based solely on the Trustee's actual knowledge, which is limited due to the Trustee's position as bankruptcy trustee.  Subject to the foregoing, Seller represents and warrants to Purchaser as follows:

8.1.1   The Seller owns the entire fee simple title interest in the Property.  Subject to Bankruptcy Court approval, Seller has full power and authority to enter into this Contract, bind Seller and the Property to the commitments made in this Contract, and convey or cause the conveyance of the Property to Purchaser.

8.1.2   The execution, delivery, and performance by Seller of this Contract will not constitute or cause a default or breach of any agreement or undertaking of Seller.

8.1.3   Seller has no knowledge and has received no notice of any claim, demand, damage, action, or cause of action of any person, entity, or governmental agency, or instrumentality affecting the Property.

8.1.4   No person or entity, except Purchaser, has been granted any rights to purchase the Property (including options to purchase and rights of first refusal to purchase the Property).

8.1.5   Seller has no knowledge of and has received no notice concerning any existing or proposed special assessments or similar taxes, charges, or assessments against the Property, or any utility service moratoriums or other moratoriums affecting the Property.

8.1.6   Seller is not aware of any condemnation or other taking of any portion of the Property by any public authority. Seller has no actual knowledge that any condemnation or taking is threatened or contemplated.

8.1.7   Seller is not aware of any violation of any law, ordinance, code, regulation or agreement with respect to the Property.

- 7 -

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

8.1.8   Seller is not aware of any latent defects concerning the Property.

8.1.9   Seller is not aware of any unrecorded leases, equipment leases, development agreements, or other agreements affecting the Property that will affect the Property after Closing.

8.1.10   To the best of Seller's knowledge, the items to be delivered to Purchaser as the Seller Deliveries will be true, accurate and complete copies of such documents. Any items listed in Exhibit D that are not delivered to Purchaser are not applicable to the Property or not reasonably in Seller's possession or control.

8.1.11   Seller is not aware of any work performed or materials supplied to the Property or contracts entered into for work to be performed or materials to be supplied to the Property before the Effective Date that have not been or will not be fully paid for on the Closing Date.

8.1.12   Seller is not aware of any noncompliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any other related enabling legislation, Executive Orders, or regulations (the Order and such other rules, regulations, legislation, or orders are collectively, the "Orders"). Seller has no knowledge that Seller or any of its affiliates are: (a) listed on the Specially Designated Nationals and Blocked Person List maintained by OFAC pursuant to the Order and/or on any other similar list maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other Orders (such lists, collectively, the "Lists"); (b) a Person (as defined in the Order) who has been determined to be subject to the prohibitions in the Orders; or (c) owned or controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acting for or on behalf of, any person on the Lists or any other Person who has been determined to be subject to the prohibitions in the Orders. This representation will not apply with respect to any pension plan participating in Seller.

8.1.13   Seller has no knowledge that the Property is now being or ever has been used for the generation, transportation, treatment, storage, or disposal of any Hazardous Substances. Seller has no knowledge that there are Hazardous Substances located on, in, about, or under the Property or the Improvements.  Seller has no knowledge that any Hazardous Substances are stored on the Property for more than ninety (90) days. "Hazardous Substances" means asbestos, urea formaldehyde, polychlorinated biphenyls, nuclear fuel or materials, chemical waste, radioactive materials, explosives, known carcinogens, petroleum products, or other dangerous, toxic, or hazardous pollutant, contaminant, chemical, material, or substance defined as hazardous or as a pollutant or contaminant in, or the release or disposal of which is regulated by, any Law or Regulation.

8.1.14   Seller has no knowledge of any past or present investigations, administrative proceedings, litigation, or other action proposed, threatened, or pending, alleging non-compliance with or violation of any Law or Regulation or relating to any required environmental permits. "Law or Regulation" means the Comprehensive Environmental Response and Liability Act ("CERCLA" or the Federal Superfund Act), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA") 42 U.S.C. 9601-9675; the Federal Resource Conservation and Recovery Act of 1876 ("RCRA"); all applicable state environmental laws; the Clean Water Act 33 U.S.C. 1321 et seq.; the Clean Air Act 42 U.S.C. 7401 et seq., all as amended; and any other existing federal, state, county, municipal, local, or other statute, law, ordinance, or regulations which may relate to or deal with human health or the environment including all regulations promulgated by a regulatory body pursuant to any such statute, law, or ordinance.

8.1.15   Seller has no knowledge of any underground storage tanks located under the Land.

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

8.1.16  Seller has no knowledge that any portion of the Property is located in an area that has been designated a wetlands or other environmental protection area.

8.1.17  Seller has no knowledge regarding the utilities to the Property.

8.1.18  Seller has no knowledge that any parties are occupying any portion of the Property other than Tenant as reflected in the Lease.  Seller has no knowledge of any options to terminate, renew, or expand the Lease, except as set forth in the Lease. Seller has no knowledge of any lease commissions due, payable, or outstanding with respect to the Property. Seller has no knowledge of any obligations under the Lease for the Landlord to perform any work or pay any concessions that will not be satisfied by Seller on or before the Closing Date.

8.2    Purchaser's Representations and Warranties.  Purchaser represents and warrants to Seller that:

8.2.1    Purchaser has the power and authority to execute and deliver this Contract and to perform its obligations under this Contract.

8.2.2    The execution of this Contract by Purchaser is the authorized and legally binding action of Purchaser, and upon execution of this Contract, Purchaser will be bound by and subject to the terms and provisions of this Contract.

8.3    Survival of Representations and Warranties.  The representations and warranties of the parties in this Contract or in any document, certificate, or other instrument, given or delivered to the other party pursuant to this Contract, will: (a) be continuing representations and warranties; (b) be deemed to be remade at Closing; (c) not merge with or into any deed of conveyance or other document or instrument delivered at or in connection with the Closing; and (d) survive the Closing for a period of sixty (60) days.

## 9.    SALE COMMISSION.

9.1    Seller's Broker.  Seller represents and warrants to Purchaser that Seller has dealt only with Seller's Broker in connection with this Contract and no other person or entity acting as real estate broker, finder, or agent negotiated this Contract on Seller's behalf or is entitled to any commission by reason of its representation of Seller in connection with this Contract.  At Closing, Seller will pay a commission to Seller's Broker pursuant to the terms and conditions of a separate agreement.

9.2    Purchaser's Broker.  Purchaser represents and warrants to Seller that Purchaser has dealt only with Purchaser's Broker in connection with this Contract and no other person or entity acting as real estate broker, finder, or agent negotiated this Contract on Purchaser's behalf or is entitled to any commission by reason of its representation of Purchaser in connection with this Contract. At Closing, Seller's Broker will pay a commission to Purchaser's Broker pursuant to the terms and conditions of a separate agreement.

10.    CONDEMNATION.  If Seller receives notice that a Condemnation has occurred before Closing, or of any Condemnation proceeding that begins before Closing, then Seller will immediately notify Purchaser and Purchaser may either: (a) terminate this Contract and the Earnest Money Deposit will be returned to Purchaser, without necessity for consent from Seller, and neither party will have any further obligations or liabilities under this Contract, except as otherwise expressly provided; or (b) proceed with the Closing. If the Purchaser proceeds with the Closing and if the Condemnation is completed before Closing, the Purchase Price will be reduced by the amount of the award received by Seller as a result of the Condemnation. If the Purchaser proceeds with the Closing and if the Condemnation is not completed before Closing, Seller will assign to Purchaser all right, title, and interest, in and to the Condemnation proceeds and awards, and Purchaser will have the sole and exclusive right to negotiate, contest, and settle all such Condemnation proceedings.  Purchaser will exercise its option under this Section 10 by providing Seller with a written notice of its decision within thirty (30) days after Purchaser receives from Seller written notice of the proposed Condemnation, and the Closing Date will be extended, if necessary,

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

to permit Purchaser to make its election within such time period.  "**Condemnation**" means any condemnation or other taking of the Property, any part of the Property, rights of access or other rights benefitting the Property, as a result of the exercise of the power of eminent domain.

**11.**    **CASUALTY.**  If Seller becomes aware that damage to the Property has occurred before Closing, Seller will immediately notify Purchaser in writing, and if the cost to repair the damage exceeds $50,000 (as determined by an independent insurance adjuster selected by Purchaser and approved by Seller), Purchaser may either: (a) terminate this Contract and the Earnest Money Deposit will be returned to Purchaser, without necessity for consent from Seller, and neither party will have any further obligations or liabilities under this Contract, except as otherwise expressly provided; or (b) proceed with the Closing.  If Purchaser is not entitled to terminate or elects not to terminate this Contract under this Section 11, then Seller will pay over and assign to Purchaser all insurance proceeds payable as a result of the damage to the Property (including all casualty insurance proceeds, and all rent loss insurance proceeds applicable to the period on or after the Closing Date) and, in addition, will pay to Purchaser at Closing an amount equal to all deductibles with respect to such damage.

**12.**    **CLOSING.**

    12.1    Time and Place of Closing.  The Closing will occur on the Closing Date, except that Purchaser may elect, at any time after entry of the Sale Order, to close at an earlier date by providing written notice to Seller at least five (5) business days before the date Purchaser desires to close.  The Closing will take place at the office of the Escrow Agent. Neither party is obligated to attend the Closing so long as they deliver their documents to the Escrow Agent at least one (1) business day before Closing and deliver their funds to the Escrow Agent on or before the Closing Date.

    12.2    Purchaser's Right to Extend.  Purchaser may extend the Closing Date for one (1) thirty (30) day period by delivering written notice to Seller before the scheduled Closing Date. Within two (2) business days after the time extension goes into effect, Purchaser will deliver to the Escrow Agent $15,000 as an additional Earnest Money Deposit. The additional Earnest Money Deposit will be held and disbursed in the same manner as the initial Earnest Money Deposit.

    12.3    Seller's Closing Deliveries.  Seller will deliver to Purchaser at Closing the following, all in form and substance reasonably acceptable to Purchaser ("**Seller's Closing Deliveries**"):

        12.3.1  A special warranty deed, conveying to Purchaser fee simple title to the Property (the "**Deed**").

        12.3.2  A special warranty assignment and bill of sale of all the Personal Property and the Intangible Property (the "**Bill of Sale**").

        12.3.3  An ALTA extended coverage statement and/or title affidavit, gap undertaking, and all other affidavits, certifications, and documents required by the Title Company in connection with its issuance of the Title Policy (the "**ALTA**"). All affidavits and certifications will be based on Seller's actual knowledge.

        12.3.4  A FIRPTA Statement from Seller certifying that Seller is not a "foreign person," "foreign estate," "foreign corporation", "foreign partnership", or any other foreign entity as these terms are defined in §1445 of the Internal Revenue Code and the income tax regulations promulgated by the Internal Revenue Code (the "**FIRPTA**").

        12.3.5  A certificate executed by Seller confirming that the representations and warranties made by Seller in this Contract remain true and correct on the Closing Date (the "**Seller's Closing Certificate**").

        12.3.6  Intentionally left blank.

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

12.3.7  Intentionally left blank.

12.3.8  A settlement statement prepared by Escrow Agent.

12.3.9  Intentionally left blank.

12.3.10 Intentionally left blank.

12.3.11 Any other documents reasonably required by the Title Company to consummate the transaction contemplated by this Contract.

12.4  Purchaser's Closing Deliveries.  Purchaser will deliver to Seller at Closing:

12.4.1  The balance of the Purchase Price, plus or minus prorations.

12.4.2  A settlement statement prepared by Escrow Agent.

12.4.3  A certificate executed by Purchaser confirming that the representations and warranties made by Purchaser in this Contract remain true and correct on the Closing Date (the "**Purchaser's Closing Certificate**").

12.4.4  Any other documents reasonably required by the Title Company to consummate the transaction contemplated by this Contract.

Approximately three (3) business days before the Closing Date, Purchaser will draft and circulate for comment by Seller the Deed, Bill of Sale, ALTA, FIRPTA, Seller's Closing Certificate, and Purchaser's Closing Certificate. All other Seller's Closing Deliveries will be prepared by Seller.

12.5  Prorations.  Before the Closing Date, Purchaser will prepare and deliver to Seller a prorations statement (the "Prorations Statement"). The parties will work in good faith to agree upon, execute and deliver the Prorations Statement to Escrow Agent before the Closing Date. If any prorations or computations made under this Section 12.5 are based on estimates or prove to be incorrect, then either party will be entitled to an adjustment to correct the same, provided that it makes written demand on the party from whom it is entitled to such adjustment within sixty (60) days after Closing. For purposes of calculating the prorations provided for in this Contract, Purchaser will be deemed to be the owner of the Property on the Closing Date. The provisions of this Section will survive the Closing.

12.6  Real Estate Taxes and Assessments.  All real estate taxes and assessments, if any, levied or assessed on or against the Property will be prorated on an accrual basis as of the Closing Date. At the Closing, Purchaser will receive a credit against the Purchase Price equal to all accrued and unpaid taxes and assessments as of the Closing Date, including: (a) all taxes and assessments attributable to the year before the Closing but not payable until after Closing; and (b) all taxes and assessments attributable to the year in which the Closing occurs but not payable until the following year.  The credit for accrued taxes and assessments for which bills have not been issued on the Closing Date will be based on 110% of the then most recent taxes and assessments. Taxes and assessments will be re-prorated between Seller and Purchaser at the time of issuance of the actual bills and payment of any adjustment based on a reproration will be paid by the party owing the other based on the adjustment within fifteen (15) days after receipt by such party of copies of the applicable bills. The provisions of this Section will survive the Closing.

12.7  Intentionally Deleted.

12.8  Operating Costs.  Seller will be responsible for all expenses necessary to repair, maintain, and replace the Property that accrue up to and including the Closing Date. Any such expenses that are prepaid as of the Closing Date will be credited to Seller. Purchaser will pay expenses accruing after the Closing Date, if any. Any expenses that have accrued up to and including the Closing Date that

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

have not been paid as of the Closing Date will  be paid out of the proceeds of sale or credited to Purchaser, provided that such credit will not release Seller of the obligation to make full payment if the credit is insufficient for any reason.  The parties will cooperate to cause all utilities to be transferred to the name of Purchaser, effective as of the Closing Date.

    12.9    <u>Miscellaneous</u>.  All other items that are customarily prorated in transactions similar to this transaction and that are not otherwise addressed in this Contract will be prorated as of the Closing Date.

    12.10    <u>Possession.</u>  Seller will deliver exclusive possession of the Property to Purchaser at Closing.  Seller will remove all debris and trash from the Property at or before Closing.

    12.11    <u>Purchaser's Closing Costs.</u>  Purchaser will pay the following expenses incurred in connection with this transaction: (a) the fee for the recording of the deed; (b) the cost of the Survey to the extent it exceeds $5,000.00; (c) one-half of all closing fees charged by the Escrow Agent and/or the Title Company (including escrow and closing charges); (d) any lender's escrow charges or other lender's fees; (e) Purchaser's legal fees and expenses; (f) any city/county/state transfer taxes; and (g) the cost of the Title Insurance Policy.

    12.12    <u>Seller's Closing Costs.</u>  Seller will pay the following expenses incurred in connection with this transaction:  (a)  the cost of the Survey, not to exceed $5,000.00; (b) one-half of all closing fees charged by the Escrow Agent and/or the Title Company (including escrow and closing charges); (c) the Grantor's Tax and Regional Relief Fee; and (d) all past due real estate taxes and all accrued real estate taxes through the Closing Date.

## 13.    **DEFAULT AND REMEDY**.

    13.1    <u>Seller Default</u>.  In the event of a default by Seller in the performance or observance of any of Seller's duties or obligations in this Contract, Purchaser, at its option and as its sole remedies, may either: (a) terminate this Contract and the Earnest Money Deposit will be returned to Purchaser without necessity for consent from Seller, and the parties will be released from all obligations and liabilities under this Contract except as otherwise expressly provided; or (b) pursue specific performance of the obligations of Seller under this Contract.

    13.2    <u>Purchaser Default</u>.  In the event of a default by Purchaser in the performance or observance of any of Purchaser's duties or obligations under this Contract and provided Seller has not defaulted in the performance of any of its obligations under this Contract, then as its sole remedy, Seller may terminate this Contract by providing written notice to Purchaser, the parties will be released from all obligations and liabilities under this Contract except as otherwise expressly provided, and Seller will receive the Earnest Money Deposit, as fair and reasonable compensation for Purchaser's default and as liquidated damages, actual damages being difficult, if not impossible to ascertain. The parties intend that under no circumstances will Seller be entitled any other legal or equitable remedy, including specific performance, under this Contract.

    13.3    <u>Notice and Cure</u>.  In the event of a default by either party, the non-defaulting party will not be permitted to exercise any rights or remedies as a result of the default until after the non-defaulting party has given the defaulting party written notice of the default and an opportunity to cure the default within ten (10) days after the default notice.

    13.4    <u>Attorneys' Fees and Legal Costs</u>.  Intentionally left blank.

14.    **NOTICES**.  Every notice required by this Contract must be in writing and will be deemed to have been delivered: (a) upon receipt or refusal of delivery, when delivered personally; (b) the day deposited with the U.S. Postal Service, when sent by certified or registered mail, postage prepaid, return receipt requested; or (c) the day deposited with a nationally recognized overnight courier service such as Federal Express, when sent by next business day delivery to a U.S. address.  In each case, a notice sent to a party must be directed to the address for that party set forth in the Basic Terms and Definitions. The

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

facsimile and email addresses included in the Basic Terms and Definitions are for information purposes only, and may not be used to satisfy the notice requirements of this Section 14.

## 15.    **MISCELLANEOUS**.

15.1    _Assignability_.  Purchaser may assign this Contract to any Affiliated Entity of Purchaser without the Seller's consent. Purchaser may not assign this Contract to any other party or entity other than an Affiliated Entity without the Seller's consent.  **"Affiliated Entity"** means any entity that owns, is owned by, controlled by or is in common control with Purchaser.

15.2    _Signage_.  Subject to all applicable laws, codes, regulations, and ordinances, upon entry of the Sale Order, Seller grants Purchaser the right to install a sign upon the Property at Purchaser's sole cost, in a design and location reasonably acceptable to Seller, directing inquiries regarding the sale or leasing of the Property to Purchaser.  The sign will comply with all sign codes or regulations in effect.  If this Contract is terminated for any reason, Purchaser, at Purchaser's sole cost, will promptly remove any sign installed by Purchaser and restore the Property to its condition before the installation of the sign.

15.3    _Survival_.  The provisions of this Contract will not be merged into any deed or other document and will survive Closing.

15.4    _Entire Agreement_.  This Contract is the complete agreement between Seller and Purchaser and supersedes all prior agreements and understandings, written and oral, between the Purchaser and Seller relating to the subject matter of this Contract, including any purchase proposals or so-called letters of intent executed by one or both of the parties.  No modification or amendment of or waiver under this Contract will be binding upon Seller or Purchaser unless in a writing signed by Seller and Purchaser.

15.5    _Time of Essence_.  Time is of the essence with respect to this Contract and each of its provisions.  If the date for payment of any sum or the performance of any obligation under this Contract by either party falls on a Saturday, Sunday, or national holiday, then the date for payment or performance will be extended to the first business day after such Saturday, Sunday, or national holiday.

15.6    _Severability_.  The invalidity or unenforceability of any provision of this Contract will not affect or impair any other provisions.

15.7    _Successors and Assigns_.  Each provision of this Contract will extend to, bind, and inure to the benefit of Seller and Purchaser and their successors, and assigns; and all references in this Contract to Seller and Purchaser will be deemed to include all such parties.

15.8    _Governing Law; Jurisdiction_.  This Contract will be governed by and construed under the laws of the state in which the Property is located.  Any dispute regarding this Contract shall be resolved by the Bankruptcy Court.

15.9    _Counterparts._  This Contract may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one document. Documents and signatures transmitted via facsimile or electronic mail (including the execution of this Contract and exchange of counterparts) will be considered original signatures for the purpose of creating a valid and binding Contract.

15.10   _Indemnity._  Seller and Purchaser agree that, except for those items to be prorated under this Contract, each party will be solely liable for the payment and performance of all costs and expenses, liabilities, obligations, and claims arising out of the party's ownership and operation of the Property before or on and after, as the case may be, the Closing Date.

15.11   _Tax Deferred Exchange_.  If requested by either party, the other party will cooperate in effectuating a tax-deferred exchange (the **"Exchange"**), including executing any documents, instruments

- 13 -

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

or agreements reasonably requested or necessary to complete the Exchange, provided the other party will not be obligated to expend any costs in connection with the Exchange or accept or assume any additional obligations or liabilities.

15.12   No Public Disclosure.   The parties will keep confidential each of the provisions of this Contract and all business strategies, plans, discoveries, or marketing information in connection with this Contract, except such disclosures as may be necessary to each party's broker, lender, attorney, accountant or engineering professionals; such disclosures as are required by law or governmental agencies; and such disclosures as are required to obtain Bankruptcy Court approval of the Contract and entry of the Sale Order by the Bankruptcy Court.

15.13   Rule of Construction.   Purchaser and Seller acknowledge that each party has actively participated in the drafting, preparation and negotiation of this Contract and each party has consulted its own independent counsel relating to any and all matters contemplated under this Contract.   Each party has agreed to enter into this Contract after the review and the rendering of such advice and each party agrees that any rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not apply in the interpretation of this Contract or any amendments to it.

15.14   Provisions Regarding Escrow Agent.   The Escrow Agent agrees to hold and apply the Earnest Money Deposit in accordance with the terms and conditions of this Contract. The following provisions will control with respect to the rights, duties and liabilities of the Escrow Agent:

15.14.1      The Escrow Agent acts as a depository only and is not responsible or liable in any manner for the: (a) sufficiency, correctness, genuineness or validity of any written instrument, notice or evidence of a party's receipt of any instruction or notice which is received by the Escrow Agent, or (b) identity or authority of any person executing the instruction, notice or evidence.

15.14.2      In the performance of its duties and obligations of this Contract, Escrow Agent may rely upon any and all statements, certifications and/or representations made to the Escrow Agent by Seller or Purchaser, without investigation or inquiry.

15.14.3      The Escrow Agent will have no responsibility under this Contract except for the performance by it in good faith of the acts to be performed by Escrow Agent under this Contract, and the Escrow Agent will have no liability except for its own breach of this Contract, willful misconduct or gross negligence.

15.14.4      The Escrow Agent will not be responsible for the solvency or financial stability of any financial institution with which Escrow Agent is directed to invest funds escrowed under this Contract.

15.14.5      The Escrow Agent will be reimbursed on an equal basis by Purchaser and Seller for any reasonable expenses incurred by the Escrow Agent arising from a dispute with respect to the amount held in escrow, including the cost of any legal expenses and court costs incurred by the Escrow Agent, should the Escrow Agent deem it necessary to retain an attorney with respect to the disposition of the amount held in escrow.

15.14.6      In the event of a dispute between the parties with respect to the disposition of the amount held in escrow, the Escrow Agent may, at its own discretion, deliver the amount to an appropriate court of law pending resolution of the dispute.

### SIGNATURE PAGE TO FOLLOW

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

Purchaser and Seller have executed this Contract on the dates written below.

**PURCHASER:**

**INSITE REAL ESTATE INVESTMENT PROPERTIES, L.L.C.**, an Illinois limited liability company

By: _____
Name: Robin Rash
Its: Manager

Date: _Febrnary 27_____, 2018

**SELLER:**

**ALANS CORNER, LLC**

By:_____
Janet M. Meiburger, not individually, but solely in her capacity as Chapter 7 Trustee for Alans Corner LLC,
Case No. 17-12669-BFK

Date: ____2/26/2018 | 1:27:25 PM EST____, 2018

**ESCROW AGENT:**

Acknowledgment: By executing below, Escrow Agent acknowledges that this Contract constitutes the escrow instructions with respect to this Contract.

**RL TITLE AND ESCROW, INC.**, a Virginia corporation

By: _____
Name: _Amir Raminpour_____
Its: _PRESIDENT_____

Date: _February 27_____, 2018

- 15 -

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

MAIN STREET CONDO 200906300043665 200905150031208P UNIT 4-5

Subject to confirmation by the Title Company and the Surveyor

Tax ID: 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-000

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

**EXHIBIT B**

**SITE PLAN/AERIAL PHOTOGRAPH**



DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC



DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

**EXHIBIT C**

**Intentionally Omitted**

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

**EXHIBIT D**

**SELLER DELIVERIES NOTICE**

InSite Real Estate Investment Properties, L.L.C.    InSite Real Estate Investment Properties, L.L.C.
c/o InSite Real Estate, L.L.C.                       c/o InSite Real Estate, L.L.C.
1400 16th Street, Suite 300                           1400 16th Street, Suite 300
Oak Brook, IL 60523                                  Oak Brook, IL 60523
Attn: Robin Rash, Chief Legal Officer               Attn: J.R. Kyes

Re:    Purchase Contract dated _____,2018 (the "**Contract**") between InSite Real Estate Investment Properties, L.L.C. ("**Purchaser**") and Alans Corner, LLC, acting by and through Janet M. Meiburger, not individually, but solely in her capacity as Chapter 7 Trustee for Alans Corner, LLC, Case No. 17-12669-BFK ("**Seller**") for the property located at 43184 Town Hall Plaza in Chantilly, VA (the "**Property**").

To whom it may concern:

This notice pertains to the Contract. All capitalized terms in this notice that are not defined will have the meanings given to them in the Contract.

Pursuant to Section 3 of the Contract, enclosed are copies of the Seller Deliveries listed below. All items marked with a ✓ below are either enclosed with this notice or have been previously delivered to Purchaser. Any items not marked with a ✓ below are either not applicable to the Property or are not reasonably within Seller's possession or control.

_____    The most recent title policy or title commitment regarding the Property.

_____    The most recent survey of the Property.

_____    Zoning documentation relating to the Property including: (a) ordinances, variances, limitations, and waivers; and (b) zoning opinions, analysis, studies, or reports.

_____    All licenses, permits, government authorizations, certificates of occupancy, and signage permits for all or any part of the Property.

_____    A list of all pending or threatened litigation relating to the Property.

_____    All documents relating to the environmental condition of the Property, including Phase I, Phase II, or other assessments, reports, notices, test results, remediation reports, closure letters, correspondence from agencies, complaints, lawsuits, or similar proceedings or enforcement actions.

_____    Any additional real estate tax bills, tax assessment letters, notices of any real estate tax increase or decrease, and all documentation evidencing Seller's efforts to reduce real estate and other taxes associated with the Property relating to the last two calendar years.

_____    Copies of all vendor and service contracts.

_____    Any interior, exterior, or aerial photographs of Property.

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

_____ All architectural, mechanical, electrical, plumbing, civil engineering, drainage, and other plans and specifications regarding the Property.

_____ All reports regarding the physical condition of the Property, including soils reports and geotechnical reports.

_____ A list of all known structural, mechanical, and other defects relating to the Property.

_____ All warranties and guaranties with respect to the Property.

_____ Monthly operating statements for the calendar year-to-date and for the immediately preceding calendar year, and annual operating statements for the two (2) years before the immediately preceding calendar year. Each statement must include: current income and expense, itemization of all capital expenditures made during the respective periods, payment records of Tenant.

_____ A tenant file for the Tenant, including: (a) the Lease (including all extensions and amendments); (b) Tenant financial statements (including a current operating statement and balance sheet); (c) lease guaranties and financial statements of any guarantors (including a current operating statement and balance sheet); (d) written correspondence with the Tenant; and (e) Tenant insurance certificates.

_____ Certificates evidencing all fire, liability, and other insurance policies presently in effect with respect to the Property, a schedule of premiums, and a statement of any insured losses during the current and preceding three (3) years.

Seller represents to Purchaser that, to the best of Seller's knowledge, Seller has complied with Seller's obligations under Section 3 of the Contract to provide Purchaser with the Seller Deliveries.

Sincerely,

**SELLER:**

**ALANS CORNER, LLC**

_____

**Janet M. Meiburger, not individually, but solely in her capacity as Chapter 7 Trustee for Alans Corner LLC, Case No. 17-12669-BFK**

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC

## EXHIBIT E

### TITLE AND SURVEY SPECIFICATIONS

**TITLE SPECIFICATIONS**. The Title Commitment and Title Policy must:

1.  be issued on ALTA Owners Policy (06-17-06) Form;
2.  name Purchaser or Purchaser's assignee as the named insured;
3.  be in the amount of the Purchase Price;
4.  include extended coverage over the standard exceptions;
5.  include affirmative coverage over all benefitting easements; and,
6.  include the following endorsements, if available in the jurisdiction where the Property is located:
    a.  access
    b.  location
    c.  subdivision
    d.  zoning
    e.  owner's comprehensive
    f.  same as survey
    g.  tax parcel
    h.  contiguity
    i.  environmental protection lien
    j.  utility access
    k.  any other endorsements as Purchaser may reasonably require.

**SURVEY SPECIFICATIONS**. The Survey must:

1.  be in compliance with the Minimum Standard Detail Requirements adopted by ALTA/NSPS in 2016;
2.  be certified to Title Company, Purchaser, and any other parties as Purchaser may designate; and
3.  include the following Table A items: 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 13, 14, 16, 17, 18, 19, and 20.

DocuSign Envelope ID: 02D02CDB-A709-4DC9-99B1-49A69B2FB0FC



## Certificate Of Completion

Envelope Id: 02D02CDBA7094DC999B149A69B2FB0FC
Subject: Please DocuSign: 2-26-2018 InSite Comments Clean.pdf
Source Envelope:
Document Pages: 23                    Signatures: 1              Envelope Originator:
Certificate Pages: 4                  Initials: 0                Stephen Karbelk
AutoNav: Enabled                                                 5990 Kingstowne Towne Center
EnvelopeId Stamping: Enabled                                     Alexandria, VA  22315
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                stephen.karbelk@c21nm.com
                                                                 IP Address: 73.216.204.97

### Record Tracking

Status: Original                      Holder: Stephen Karbelk          Location: DocuSign
        2/26/2018 11:30:05 AM                 stephen.karbelk@c21nm.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Janet M. Meiburger<br>janetm@meiburgerlaw.com<br>Security Level: Email, Account Authentication<br>(None) | *Janet M. Meiburger*<br>—8D4F143787E946C...<br><br>Using IP Address: 173.73.91.102 | Sent: 2/26/2018 11:33:08 AM<br>Viewed: 2/26/2018 1:26:39 PM<br>Signed: 2/26/2018 1:27:25 PM |
| Electronic Record and Signature Disclosure:<br>  Accepted: 2/26/2018 1:26:39 PM<br>  ID: d2bbe671-e83d-497e-b3ac-f97b921ad5cf | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/26/2018 11:33:08 AM |
| Certified Delivered | Security Checked | 2/26/2018 1:26:39 PM |
| Signing Complete | Security Checked | 2/26/2018 1:27:25 PM |
| Completed | Security Checked | 2/26/2018 1:27:25 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 4/6/2015 2:52:59 PM
Parties agreed to: Janet M. Melburger

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Century 21 New Millennium (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures

electronically from us.

**How to contact Century 21 New Millennium:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: herb.lisjak@c21nm.com

**To advise Century 21 New Millennium of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at herb.lisjak@c21nm.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Century 21 New Millennium**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to herb.lisjak@c21nm.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Century 21 New Millennium**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to herb.lisjak@c21nm.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | Allow per session cookies |

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Century 21 New Millennium as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Century 21 New Millennium during the course of my relationship with you.